UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
NICOLE TOSI,

              Plaintiff,

      v.

WILLIAMS-SONOMA, INC.,

              Defendant.
------------------------------------------------------------------X

**DECISION AND ORDER**
22-CV-4162 (WFK) (VMS)

**WILLIAM F. KUNTZ, II, United States District Judge:**

Nicole Tosi ("Plaintiff") brings this action against Williams-Sonoma, Inc. ("Defendant") for alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. § 621 *et seq.*; the New York City Human Rights Law (the "NYCHRL"), New York City Administrative Code § 8-502(a) *et seq.*; the New York Labor Law (the "NYLL"), Article 6; and New York common law. Before the Court are Defendant's Motion to Dismiss, ECF No. 33; and Defendant's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 51. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**, and Defendant's Motion to Dismiss is denied as **MOOT**.

## I.    <u>BACKGROUND</u>[1]

### A.  FACTUAL BACKGROUND

The following facts are drawn from the parties' Local Rule 56.1 Statements, declarations, deposition testimony, and other evidence submitted in support of the motion. *See* Fed. R. Civ. P. 56(c); *see generally* Def.'s Statement of Undisputed Material Facts ("Def.'s Facts"), ECF No. 51-19; Pl.'s Opposing Statement of Material Facts ("Pl.'s Opp. Facts"), ECF No. 52-1; Pl.'s Additional Statement of Material Facts ("Pl.'s Add. Facts"), ECF No. 52-2; Def.'s Response to

---

[1] Citations are to the docket in *Tosi v. Williams-Sonoma, Inc.*, 22-CV-4162. Page pincites refer to the ECF page numbers assigned to a filing, where available, and where no ECF heading is present, to the page numbers listed in the original filing.

Pl's Add. Facts, ECF No. 53-1; Pl.'s Second Additional Statement of Material Facts ("Pl.'s Sec. Add. Facts."), ECF No. 71-1; Def.'s Response to Pl.'s Sec. Add. Facts, ECF No. 72-1.

At the summary judgment phase, "all factual ambiguities are resolved, and all reasonable inferences are drawn, in the light most favorable to the non-moving party." *Bronnberg v. LM Gen. Ins. Co.*, 20-CV-002, 2025 WL 2576525, at *1 (E.D.N.Y. Sept. 5, 2026) (Kuntz, J.) (citing *Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005)). Facts supported by the record and not contradicted by admissible evidence are admitted. *See Sanchez v. N.Y.C. Transit Auth.*, 17-CV-5818, 2020 WL 5763860, at *1 n.1 (E.D.N.Y. Sept. 28, 2020) (DeArcy Hall, J.) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (quoting *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003))).

### i. The Parties

Plaintiff is a former Account Executive employed by Defendant from May 19, 2014 until January 15, 2020. *See* Def.'s Facts ¶ 1; Pl.'s Opp. Facts ¶ 1. Defendant is a specialty retailer of home furnishings and gourmet cookware operating through a variety of brands, including Rejuvenation, West Elm, and Pottery Barn. *See* Def.'s Facts ¶ 2; Pl.'s Opp. Facts ¶ 2

### ii. Plaintiff's Initial Employment and Restructuring of Account Executives

In May 2014, Defendant hired Plaintiff to work as a Sales Account Executive for its Rejuvenation brand based in Portland, Oregon. Def.'s Facts ¶ 3; Pl.'s Opp. Facts ¶ 3. In this role, Plaintiff facilitated the sales of Rejuvenation products to architects, designers, and purchasing agents within an assigned sales territory. Def.'s Facts ¶ 5; Pl.'s Opp. Facts ¶ 5. Her starting salary was $75,000.00. Def.'s Facts ¶ 4; Pl.'s Opp. Facts ¶ 4.

Plaintiff initially reported to Jerry Huettmann, the National Sales Director for Rejuvenation. Def.'s Facts ¶ 6; Pl.'s Opp. Facts ¶ 6. During Plaintiff's employment as a Sales Account Executive for Rejuvenation, from May 2014 to mid-2017, there were approximately three or four other Account Executives in the "Trade + Contract" division. Def.'s Facts ¶ 7; Pl.'s Opp. Facts ¶ 7. All the Account Executives were female, "some older and some younger than Plaintiff." Def.'s Facts ¶ 7; Pl.'s Opp. Facts ¶ 7.

In June 2017, Defendant hired Josie Driscoll as Director of Contract at West Elm. Def.'s Facts ¶ 8; Pl.'s Opp. Facts ¶ 8. Under Driscoll's leadership, Defendant dissolved the Trade + Contract division and began operating instead as a "cross-brand Business To Business ('B2B') team in Spring 2019." Def.'s Facts ¶ 8; Pl.'s Opp. Facts ¶ 8. All Account Executives, like Plaintiff, were tasked with selling products across all brands to commercial clients within assigned territories. Def.'s Facts ¶ 8; Pl.'s Opp. Facts ¶ 8.

In May 2019, Driscoll eliminated Huettmann's "national" Sales Director position and split authority over the B2B Account Executives between an East Coast and West Coast Sales Director. Def.'s Facts ¶ 9; Pl.'s Opp. Facts ¶ 9. Driscoll hired Ryan Haggett for the East Coast Sales Director position in May 2019. Def.'s Facts ¶¶ 9; Pl.'s Opp. Facts ¶ 9; *see also* Pl.'s Add. Facts ¶¶ 82–83. Plaintiff reported directly to Haggett from the time of his hiring until she ceased working for Defendant in January 2020. Def.'s Facts ¶ 10; Pl.'s Opp. Facts ¶ 10. From the time Defendant transitioned to the B2B model until the end of Plaintiff's employment, there were approximately six Account Executives, all female and of varying ages, with the exception of a short period where a younger, male Account Executive worked on the team. Def.'s Facts ¶ 11; Pl.'s Opp. Facts ¶ 11.

3

### iii. Plaintiff's Work Location and Home Office Designation

During her employment with Defendant, Plaintiff lived in New Hampshire. *See* Def.'s Facts ¶ 12; Pl.'s Opp. Facts ¶ 12 (noting Plaintiff's "home" was in New Hampshire).

From May 2014 until July 2017, Plaintiff spent approximately two weeks of each month working from New York City. Def.'s Facts ¶ 13; Pl.'s Opp. Facts ¶ 13. After July 2017, Plaintiff traveled to New York to attend one or two trades shows per year, and for corporate meetings three to four times per year. *See* Def.'s Facts ¶ 14; Pl.'s Opp. Facts ¶ 14.[2]

### iv. Plaintiff's Complaints Related to Her Receipt of Bonuses

At various points during her employment, Plaintiff received bonus payments from Defendant. *See* Def.'s Facts ¶ 23; Pl.'s Opp. Facts ¶ 23 (admitting Plaintiff "was paid bonuses" but denying she was paid the proper amounts). Plaintiff alleges, in part: (1) she was not paid the full annual bonuses she earned; (2) bonus metrics were being tracked improperly by Defendant; and (3) she was subject to "an ongoing pattern of retaliation for speaking out about unpaid wages." Pl.'s Opp. Facts ¶ 16; *see also* Def.'s Facts ¶ 16. On at least one occasion, Plaintiff emailed the Human Resources department to express confusion about the metrics by which her bonus and sales goals were being calculated. *See* Pl.'s Add. Facts ¶ 8; Def.'s Resp. to Pl.'s Add. Facts ¶ 8. Other Account Executives also faced issues with receipt of their bonus payments. *See* Def.'s Facts ¶ 17; Pl.'s Opp. Facts ¶ 17. However, while others complained about bonus payments, individuals in Human Resources indicated Plaintiff expressed her concerns "much more strongly." *See* Pl.'s Add. Facts ¶ 11; Def.'s Resp. to Pl.'s Add. Facts ¶ 11.

In 2015, Plaintiff complained to Huettmann and Human Resources after Defendant initially refused to pay her end-of-year bonus for failing to meet her end-of-year sales target for

---

[2] Plaintiff considered herself to be a Brooklyn-based employee throughout her employment. *See* Pl.'s Opp. Facts ¶ 14.

2014. *See* Def.'s Facts ¶ 19; Pl.'s Opp. Facts ¶ 19. Plaintiff disputed Defendant's findings and was ultimately paid $23,000.00. *See* Def.'s Facts ¶ 19; Pl.'s Opp. Facts ¶ 19.

In 2016, Plaintiff did not receive a bonus for work she performed in 2015. Def.'s Facts ¶ 20; Pl.'s Opp. Facts ¶ 20. Plaintiff and other Account Executives again complained to Huettmann and Human Resources, and it was discovered some of Plaintiff's sales—as well as those of other Account Executives—had been improperly credited to a retail store. Def.'s Facts ¶ 20; Pl.'s Opp. Facts ¶ 20; Pl.'s Add. Facts ¶¶ 34, 37; Def.'s Resp. to Pl.'s Add. Facts ¶¶ 34, 37. Defendant ultimately informed employees no bonuses would be awarded to any Account Executive for work performed in 2015. Def.'s Facts ¶ 21; Pl.'s Opp. Facts ¶ 21; Pl.'s Add. Facts ¶ 31; Def.'s Resp. to Pl.'s Add. Facts ¶ 31. Plaintiff raised concerns about bonuses and her compensation to her supervisors and Human Resources on several occasions. *See, e.g.,* Pl.'s Add. Facts ¶¶ 55–59; Def.'s Resp. to Pl.'s Add. Facts ¶¶ 55–59.

From 2017 to 2019, Plaintiff received bonus payments from Defendant. Def.'s Facts ¶ 23; Pl.'s Opp. Facts ¶ 23. Plaintiff contends she was not paid the correct amount for any year from 2015 through 2019. Pl.'s Opp. Facts ¶ 23.

### v. May 2016 Los Vegas Trade Show Incident

Throughout Plaintiff's employment with Defendant, she attended trade shows in Las Vegas, Nevada. Def.'s Facts ¶ 27; Pl.'s Opp. Facts ¶ 27.

In preparation for a trade show in May 2016, Huettmann sent an email to all Account Executives—including Plaintiff—explaining his dress code expectations for the event. Def.'s Facts ¶ 28; Pl.'s Opp. Facts ¶ 28. The email included links to suggested outfits and pictures of models wearing red lipstick. Def.'s Facts ¶ 28; Pl.'s Opp. Facts ¶ 28. According to Plaintiff, Huettman also sent red lipstick to her home. Def.'s Facts ¶ 28; Pl.'s Opp. Facts ¶ 28. Plaintiff

testified she and all the other Account Executives were similarly "appalled" by Huettmann's email. Def.'s Facts ¶ 29; Pl.'s Opp. Facts ¶ 29.

Plaintiff and other Account Executives ultimately complied with Huettmann's request. Def.'s Facts ¶ 30; Pl.'s Opp. Facts ¶ 30. However, at some point during the trade show, Plaintiff removed her high heels. Def.'s Facts ¶ 30; Pl.'s Opp. Facts ¶ 30. Huettmann subsequently "berated" her on the trade show floor. Def.'s Facts ¶ 30; Pl.'s Opp. Facts ¶ 30.

After the trade show, Plaintiff did not report nor complain about Huettmann's email, his expectations, or his alleged outburst. Def.'s Facts ¶ 31; Pl.'s Opp. Facts ¶ 31. Weeks later, a Human Resources Manager contacted Plaintiff to discuss the incident in response to complaints made by other Account Executives. Def.'s Facts ¶ 31; Pl.'s Opp. Facts ¶ 31. Plaintiff does not know whether Huettmann was ultimately disciplined by Defendant for his actions at the trade show. Def.'s Facts ¶ 33; Pl.'s Opp. Facts ¶ 33.

### vi. July 2017 Territory Reduction and Realignment

From the beginning of Plaintiff's employment until July 2017, her sales territory included the Northeast, spanning as far south as Virginia. *See* Def.'s Facts ¶ 34; Pl.'s Opp. Facts ¶ 34. On or about July 25, 2017, Defendant reduced Plaintiff's territory to New England, notably removing Plaintiff's responsibility over the New York sales territory. Def.'s Facts ¶ 35; Pl.'s Opp. Facts ¶ 35.[3] Defendant purportedly made this change because it wanted to have an Account Executive serving the New York territory who lived in New York. *See* Def.'s Mot. Ex. I. at 1, ECF No. 51-10 (internal company email correspondence stating "[w]hile I hate to take [the New

---

[3] At some point on or around this time, Eastern Canada was added to Plaintiff's territory. *See* Def.'s Mot. Ex. I at 1, ECF No. 51-10 (internal company email correspondence noting "[w]e have given [Plaintiff] back Eastern Canada to offset – something she had been asking for.")

York territory] away from [Plaintiff], as discussed – feel strongly having a rep based in NY handle NY is a necessary business decision"); Def.'s Facts ¶ 36.

Plaintiff was disappointed Defendant did not give her an opportunity to move to New York to keep that territory, contending Defendant had no legitimate business reason for making the change. *See* Def.'s Facts ¶ 36; Pl.'s Opp. Facts ¶ 36. Leslie McCoy, a female approximately Plaintiff's age, subsequently took over the New York sales territory. Def.'s Facts ¶ 37; Pl.'s Opp. Facts ¶ 37. Plaintiff believes the decision was retaliation for complaints she made about her treatment by WSI—including her 2015 and 2016 bonus payments—however she acknowledged she was unaware of the decision-making process. Def.'s Facts ¶¶ 36, 38–39; Pl.'s Opp. Facts ¶ 36, 38–39. At the time of the territory reassignment, Plaintiff was the highest paid Account Executive on her team. *See* Def.'s Facts ¶ 40; Pl.'s Opp. Facts ¶ 40.

### vii. Plaintiff's Interest in Promotion and Strained Relationship with Driscoll

From the beginning of her employment, Plaintiff was interested in growing her career with Defendant. Def.'s Facts ¶ 41; Pl.'s Opp. Facts ¶ 41; *see also* Pl.'s Add. Facts ¶ 152; Def.'s Resp. to Pl.'s Add. Facts ¶ 152. In July 2016, Plaintiff wrote to Andrew Bellos, former Senior VP and General Manager of Defendant's Rejuvenation Division, to express her interest in increased responsibility and growth. *See* Murphy Decl., Ex. J., at 1, ECF No. 51-11 (email correspondence between Plaintiff and Bellos); Def.'s Facts ¶ 41; Pl.'s Opp. Facts ¶ 41; Pl.'s Add. Facts ¶ 35; Def.'s Resp. to Pl.'s Add. Facts ¶ 35. At the time, Plaintiff did not have a specific role in mind; she simply assumed there would be an opportunity for her at some point. Def.'s Facts ¶ 42; Pl.'s Opp. Facts ¶ 42. Bellos informed Plaintiff there were no roles currently open, but he would "of course be reviewing with [Plaintiff] first" if any such opportunities arose. Murphy Decl., Ex. J. at 1; *see also* Def.'s Facts ¶ 42; Pl.'s Opp. Facts ¶ 42; Pl.'s Add. Facts ¶ 36;

7

Def.'s Resp. to Pl.'s Add. Facts ¶ 36. Throughout her employment, Plaintiff continued to express interest in growing her role with Defendant. Def.'s Facts ¶ 43; Pl.'s Opp. Facts ¶ 43. She acknowledges, however, she never formally applied to any open positions. Def.'s Facts ¶ 43; Pl.'s Opp. Facts ¶ 43.

In approximately April or May 2019, Plaintiff received a call from Driscoll to let her know her supervisor, Huettmann, would be leaving the company, and the role of Eastern U.S. Sales Director would be filled by Haggett. Def.'s Mot., Ex. C, at 322:22–323:6 ("Pl.'s Tr."), ECF No. 51-3; Def.'s Facts ¶ 9; Pl.'s Opp. Facts ¶ 9; Pl.'s Add. Facts ¶ 83; Def.'s Resp. to Pl.'s Add. Facts ¶ 83. Plaintiff was upset and contends she should have been considered for the position. Def.'s Facts ¶¶ 45, 47; Pl.'s Opp. Facts ¶¶ 45, 47. After receiving this information, Plaintiff called Human Resources Manager Christy Struckman from her home in New Hampshire to complain about not being given the opportunity to apply for the role. Def.'s Facts ¶ 47; Pl.'s Opp. Facts ¶ 47.

Driscoll testified she hired Haggett because they had a prior working relationship and she believed he would be a strong candidate in light of his experience working for Restoration Hardware, a much larger business. Def.'s Facts ¶ 46; Pl.'s Opp. Facts ¶ 46

Apart from Plaintiff's disagreement with the decision to hire Haggett, Plaintiff also testified to tension between herself and Driscoll's management style. *See* Pl.'s Tr. at 289:12–13 (describing Driscoll's management style as, generally, unfair). For example, Plaintiff described several instances where Driscoll purportedly "screamed" and "yelled" at Plaintiff and other Account Executives. Def.'s Facts ¶¶ 49–51; Pl.'s Opp. Facts ¶¶ 49–51. Plaintiff also contends Driscoll accused her and some of her colleagues of "not being team players" and "mean girls"

after they purportedly declined Driscoll's invitation to go to a bar after a trade show in Las Vegas. Def.'s Facts ¶¶ 51–52; Pl.'s Opp. Facts ¶¶ 51–52.

### viii. Events Leading to Plaintiff's Departure from Defendant

#### 1. Plaintiff's Negative Mid-Year Review and Performance Improvement Plan

Haggett testified he delivered mid-year reviews to Account Executives in October 2019. *See* Def.'s Mot., Ex. D, at 47:4–5, ECF No. 51-5 ("Haggett Tr."); Pl.'s Add. Facts ¶ 88; Def.'s Resp. to Pl.'s Add. Facts ¶ 88. Prior to each meeting, Haggett purportedly requested each Account Executive come "prepared with goals and objectives to finish out the year." Haggett Tr. 64:3–10. According to Haggett, Plaintiff failed to prepare the requested materials, which Plaintiff denies. *See* Def.'s Facts ¶ 54 (citing Haggett. Tr. at 64:6–10); Pl.'s Opp. Facts ¶ 54 (stating, "[Plaintiff] always provided what Haggett asked for."). Haggett delivered a negative mid-year review to Plaintiff first via email and subsequently spoke to her on the phone to discuss its contents on October 4, 2019, while she was at her home office in New Hampshire. *See* Def.'s Facts ¶ 55; Pl.'s Opp. Facts ¶ 55 (describing the evaluation as "negative" and denying only Haggett's intention for delivering the mid-year evaluation).

A few days after Plaintiff received her mid-year review, Haggett issued Plaintiff a performance improvement plan (the "PIP"). *See* Def.'s Facts ¶ 60; Pl.'s Opp. Facts ¶ 60. Shortly after, Plaintiff, Haggett, and Nicole Mighty, a Human Resources manager, spoke about the PIP via telephone. Def.'s Facts ¶ 62; Pl.'s Opp. Facts ¶ 62. The PIP cited several examples of Plaintiff "not demonstrating the level of initiative, engagement, collaboration or professional and effective communication expected of an Account Executive." Def.'s Mot., Ex. K at 1 ("Ex. K"), ECF No. 51-12; Pl.'s Add. Facts ¶ 137; Def.'s Resp. to Pl.'s Add. Facts ¶ 137. The PIP also reported several statements Plaintiff made which Haggett found to be "not acceptable for

9

someone in a client-facing sales role." Ex. K. at 2; *see also* Pl.'s Opp. Facts ¶ 63 (admitting Plaintiff made the cited statements). Plaintiff believed the PIP was unwarranted. *See* Def.'s Facts ¶ 68; Pl.'s Opp. Facts ¶ 68.

### 2. *Plaintiff's Reduction of Territory and Salary Disputes After Her Temporary Assignment*

In December 2018, Plaintiff was temporarily assigned as the acting Account Executive for the Southeast sales territory. *See* Def.'s Facts ¶ 70; Pl.'s Opp. Facts ¶ 70; Pl.'s Add. Facts ¶ 80; Def.'s Resp. to Pl.'s Add. Facts ¶ 80; Def.'s Mot., Ex. L at ECF No. 51-13 ("Temp. Assignment Letter"). Plaintiff was aware the position was temporary at the time of assignment. *See* Temp. Assignment Letter at 1 ("The anticipated [duration] of the assignment is 3-6 months."); Def.'s Facts ¶ 70; Pl.'s Opp. Facts ¶ 70. For the increased responsibility, Plaintiff's annual salary was temporarily raised from $112,000.00 to $135,000.00. Temp. Assignment Letter at 1; Def.'s Facts ¶ 71; Pl.'s Opp. Facts ¶ 71.

In October 2019, while still serving as the Account Executive for the Southeast sales territory, Plaintiff reached out to Haggett via email to inquire why she did not receive a salary increase commensurate with other Account Executives on the team. Def.'s Facts ¶ 72; Pl.'s Opp. Facts ¶ 72; Pl.'s Add. Facts ¶ 93; Def.'s Resp. to Pl.'s Add. Facts ¶ 93. In the email, Plaintiff indicated, she had been "made aware that all the other [Account Executives] received a salary increase" which was "presented as an acknowledgement that . . . [Defendant] appreciates the work that [they] do and the team was to be awarded increases in salaries to bring [them] up to industry standards." Def.'s Mot., Ex. M at 2, ECF No. 51-14 (internal email correspondence between Plaintiff and Haggett). Haggett responded to Plaintiff, noting it was "neither professional nor appropriate to discuss compensation in this manner" and he "would be in touch with HR to discuss." *Id.* Plaintiff interpreted Haggett's response as a reprimand for raising the

issue, but Haggett testified he was legitimately appreciative Plaintiff alerted him to what he believed to be improper discussions about confidential compensation information among Account Executives. Def.'s Facts ¶ 75; Pl.'s Opp. Facts ¶ 75.

On November 26, 2019, Haggett called Plaintiff at her home in New Hampshire to let her know Defendant hired a replacement for the Southeast territory, her temporary assignment would end, and the increase to her salary would terminate effective January 20, 2020. Def.'s Facts ¶¶ 75–76; Pl.'s Opp. Facts ¶¶ 75–76. Plaintiff testified the end of her temporary assignment— coupled with the PIP she received earlier the same month—left her "emotionally distraught." Def.'s Facts ¶ 77; Pl.'s Opp. Facts ¶ 77. On or about December 2, 2019, Plaintiff commenced a thirty-day leave of absence from her role. Def.'s Facts ¶ 77; Pl.'s Opp. Facts ¶ 77.

Plaintiff returned to work on or about January 2, 2020, but left her position shortly thereafter on January 15, 2020. Def.'s Facts ¶ 79; Pl.'s Opp. Facts ¶ 79.

## B. PROCEDURAL HISTORY

Plaintiff filed a Complaint of Discrimination with the New York State Division of Human Rights (the "NYSDHR") on January 12, 2021. Def.'s Facts ¶ 85; Pl.'s Opp. Facts ¶ 85; *see also* Def.'s Mot., Ex. O at 8, ECF No. 51-16 (NYSDHR Complaint). On April 4, 2022, the NYSDHR dismissed the Complaint of Discrimination at Plaintiff's request, annulling Plaintiff's election of remedies so she could pursue her claims in court. Def.'s Facts ¶ 86; Pl.'s Opp. Facts ¶ 86; Def.'s Mot., Ex. P, ECF No. 51-17 (NYSDHR Annulment Determination).

On July 15, 2022, Plaintiff filed her initial complaint against Defendant alleging fourteen causes of action. Compl., ECF No. 1; Def.'s Facts ¶ 87; Pl.'s Opp. Facts ¶ 87.

On November 22, 2022, Defendant filed a letter with this Court stating it had served a motion to dismiss on Plaintiff. Def.'s Nov. 22, 2022 Letter at 1, ECF No. 14. On January 9,

2023, Plaintiff filed a letter with this Court stating she had served her opposition to the motion to dismiss on Defendant. Pl.'s Jan. 9, 2023 Letter at 1, ECF No. 19. The same day, Plaintiff filed a letter with the Court requesting a pre-motion conference in advance of filing a motion for leave to amend her complaint. Pl.'s Mot. for Pre-Motion Conference at 1, ECF No. 20.

On January 12, 2023, Defendant filed a motion consenting to Plaintiff's request to amend her complaint and seeking permission from the Court to withdraw its motion to dismiss without prejudice. Mot. to Withdraw, ECF No. 21.[4] On January 23, 2023, the Court granted Plaintiff thirty days to file an amended complaint. ECF No. 23.

On February 20, 2023, Plaintiff filed the now-operative amended complaint (the "Amended Complaint" or "Am. Compl.") asserting thirteen causes of action against Defendant: (1) sex-based discrimination in violation of Title VII; (2) sex-based discrimination in violation of NYCHRL; (3) sexual harassment and hostile work environment in violation of Title VII; (4) sexual harassment and hostile work environment in violation of NYCHRL; (5) quid pro quo sexual harassment in violation of Title VII; (6) quid pro quo sexual harassment in violation of NYCHRL; (7) retaliation for opposing a practice in violation of Title VII; (8) retaliation for opposing a practice in violation of NYCHRL; (9) age discrimination in violation of the ADEA; (10) age discrimination in violation of NYCHRL; (11) unpaid wages in violation of NYLL; (12) retaliation in violation of NYLL; and (13) common law breach of contract. Am. Compl. ¶¶ 134–237, ECF No. 24.

On June 21, 2023, pursuant to this Court's bundling rules, the parties filed (1) Defendant's fully briefed Motion to Partially Dismiss Plaintiff's Amended Complaint, ECF No.

_____

[4] Because Defendant's first motion to dismiss was never fully briefed, it was never filed with this Court pursuant to the Court's bundling rules. *See* Individual Mot. Practices and Rules of Hon. William F. Kuntz, II, § G.1.

12

33; (2) Plaintiff's Opposition to the Motion to Dismiss, ECF No. 34; and (3) Defendant's Reply to the Opposition, ECF No. 35.

On April 1, 2024, pursuant to this Court's bundling rules, the parties filed (1) Defendant's Motion for Summary Judgment, ECF No. 51; (2) Plaintiff's Partial Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp."), ECF No. 52; and (3) Defendant's Reply in Support of its Motion for Summary Judgment ("Def.'s Reply"), ECF No. 53. In her partial opposition, Plaintiff voluntarily agreed to the dismissal of Counts Three, Four, Five and Six of the Amended Complaint. *See* Pl.'s Opp. at 7.

On February 3, 2025, Plaintiff filed a Motion for Leave to File Document to Supplement Summary Judgment Record, ECF No. 60, which Defendant opposed, ECF No. 61.

On July 29, 2025, the Court held oral argument in the instant case. *See* July 29, 2025 Min Entry. During the proceedings, the Court granted Plaintiff's request to submit supplemental briefing on Defendant's Motion for Summary Judgment as well as for leave to expand the summary judgment record. *Id.*; *see also* July 29, 2025 Order, ECF No. 65. The Court scheduled trial to commence on November 17, 2025, which was later adjourned to May 11, 2026. July 29, 2025 Order; Sept. 3, 2025 Order, ECF No. 68.

On September 19, 2025, Plaintiff filed her supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Supp. Opp."), ECF No. 71, and Defendant filed its supplemental Reply in Support of its Motion for Summary Judgment ("Def.'s Supp. Reply"), ECF No. 72, and Reply in Response to Plaintiff's Additional/Supplemental Opposition ("Def.'s Reply to Supp. Opp."), ECF No. 73.

On February 2, 2026, the Court adjourned trial to commence on Monday, September 28, 2026, at 9:30 A.M. *See* Sched. Order, ECF No. 75.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).  "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* (internal quotation marks omitted).

When evaluating summary judgment motions, trial courts must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004), *abrogated on other grounds by Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) (internal quotation marks omitted)).  Importantly, "the court is not to make credibility determinations or weigh the evidence." *Rupp v. Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024).  Instead, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (internal quotation marks omitted).

## III.  <u>ANALYSIS</u>

### A. Plaintiff's Title VII and ADEA Claims Are Untimely

For both Title VII and ADEA actions, a plaintiff must first file a complaint with the U.S.

Equal Employment Opportunity Commission (the "EEOC") or the NYSDHR within 300 days of the alleged discriminatory action. 42 U.S.C. § 2000e-5(e); 29 U.S.C. § 626(d)(1)(B); *see Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 328 (2d Cir. 1999); *Francois v N.Y.C. Dept. of Ed.*, 21-601, 2021 WL 4944458, at *1 (2d Cir. Oct. 25, 2021). Plaintiff filed her action with the NYSDHR on January 12, 2021. Def.'s Facts ¶ 85; Pl.'s Opp. Facts ¶ 85. Therefore, any discriminatory acts which occurred prior to March 18, 2020—300 days prior to Plaintiff's January 12, 2021 filing with the NYSDHR—are time-barred.

### i. New York State Executive Orders 202.08 and 202.67 Do Not Toll the Statute of Limitations for Plaintiff's Federal Claims

Both parties suggest Plaintiff had an additional 228 days to pursue her federal claims pursuant to New York State Executive Orders 202.08 and 202.67, which tolled state statute of limitations and other procedural deadlines during the COVID-19 pandemic. *See* Def.'s Mot. at 13–14 (citing N.Y. Exec. Ord. 202.08 and 202.67); Pl.'s Opp. at 8–9 ("[T]he tolling provisions…[are] appropriate and applicable to each of the Counts in the Complaint.").

Not so. The executive orders issued during the COVID-19 pandemic "did not purport to toll time periods prescribed by federal law[.]" *Romero v. Manhattan and Bronx Surface Transit Operating Author.*, 21-CV-4951, 2022 WL 624451, at *5 (S.D.N.Y. Mar. 2, 2022) (Liman, J.); *see also In re Stephens,* 21-CV-42857, 2024 WL 74897, at *7 (Bankr. E.D.N.Y. Jan. 5, 2024) (Mazer-Marino, J.) ("The [COVID-19] executive orders only tolled the statutes of limitations for causes of action arising under New York State law, not federal law."); *Zablauskas v. Dept. of Ed. of City of New York*, 24-CV-5633, 2025 WL 2653001, at *3 (S.D.N.Y. Sept. 16, 2025) (Vyskocil, J.) ("[I]t is well settled law [in the Southern District] that these New York state executive orders which tolled state statute of limitations and other procedural deadlines during the COVID-19 pandemic do not apply to federal claims such as Plaintiff's Title VII claim.").

15

Where, as here, the federal statutes at issue contain their own statute of limitations, "[they are] unaffected by state tolling rules." *Latif v. City of New York*, 20-CV-8248, 2024 WL 1348827, at *4 n.3 (S.D.N.Y. Mar. 28, 2024) (Torres, J.); *see also Ekpe v. City of New York*, 20-CV-9143, 2024 WL 1621207, at *5 n.4 (S.D.N.Y. Apr. 12, 2024) (Torres, J.) (rejecting application of the COVID-19 tolling provisions to Title VII and ADEA claims).

Accordingly, the operative date for the timely filing of Plaintiff's Title VII and ADEA claims was not tolled by the COVID-19 executive orders and remained March 18, 2020.

### ii. The Continuing Violation Doctrine Does Not Save Plaintiff's Untimely Federal Claims

Plaintiff acknowledges some of her claims are time-barred but argues she has demonstrated "discrete acts of age and gender discrimination within the limitations period," and "repeated conduct that occurred over a series of . . . years" which render her age, gender, and retaliation claims timely pursuant to the continuing violation doctrine. *See* Pl.'s Opp. at 11, 16 (internal quotation marks omitted). Plaintiff notes, for instance, her "gender and age claims continued from April of 2019 (Haggett's hire date) through October of 2019 (Harker's hire date), and the date of her constructive discharge (January 15, 2020) through the date of her anticipated salary reduction (January 20, 2020)." *Id.* at 11.

While Plaintiff is correct "[a]n exception to the 300-day rule applies . . . if the discrimination [Plaintiff alleges] constitutes 'a continuing violation[,]'" *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023), the Second Circuit has "declined to extend its applicability absent compelling circumstances." *McKinnies v. City of New York*, 23-CV-2567, 2024 WL 4333703, at *5 (E.D.N.Y. Sept. 27, 2024) (Gonzalez, J.) (internal citation omitted). "To trigger the continuing violation doctrine . . . the plaintiff must allege *both* the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that

policy." *Shomo v. City of New York,* 579 F.3d 176, 181 (2d Cir. 2009) (emphasis added) (internal quotation marks and citation omitted).

Here, Plaintiff fails to identify a single act of discrimination which took place within the 300-day window after March 18, 2020. *See generally* Def.'s Facts; Pl.'s Opp. Facts; Pl.'s Add. Facts; Def.'s Response to Pl's Add. Facts; Pl.'s Sec. Add. Facts; Def.'s Response to Pl.'s Sec. Add. Facts. Plaintiff ceased working for Defendant on January 15, 2020, and the latest act of discrimination she alleges appears to be the date of her anticipated salary reduction on January 20, 2022.[5] *See* Pl.'s Opp. at 11. Where a plaintiff fails "to allege even one act of discrimination within the limitations period," she "cannot satisfy the continuing violation exception[.]" *Militinska-Lake v. Kirnon,* 22-CV-2667, 2023 WL 7648511, at *3 (2d Cir. Nov. 15, 2023).

Therefore, Plaintiff's Title VII and ADEA claims are untimely. Counts One, Seven and Nine are hereby dismissed.[6]

### B. Supplemental Jurisdiction Over Plaintiff's Remaining Claims

Plaintiff initiated this suit pursuant to federal question jurisdiction. *See* Civil Cover

---

[5] For the avoidance of any doubt, Plaintiff's allegations about the discrimination Dolletta Mitchell faced from 2020 through 2024 do not render her personal discrimination claims timely. *See generally* Pl.'s Sec. Add. 56.1 Facts.

[6] Independently, Plaintiff seemingly failed to follow the proper procedural steps for filing her Title VII claims. To initiate a Title VII action in federal court, "a plaintiff must [(1)] exhaust administrative remedies by presenting the claims forming the basis of the suit to the EEOC or the equivalent state agency, here, the NYSDHR, and [(2)] obtain[] from the EEOC a Notice of Right to Sue." *Speroni v Nova Healthcare Admin'rs,* 21-CV-1260, 2022 WL 17178352, at *4 (W.D.N.Y. Sept. 27, 2022) (Foschio, M.J.) (citing 42 U.S.C. § 2000e-5(e), (f)), *report and recommendation adopted by* 2022 WL 17177126 (W.D.N.Y. Nov. 22, 2022) (Sinatra, Jr., J.). In hundreds of pages of briefing materials, Plaintiff does not draw the Court's attention to any evidence she received an EEOC Notice of Right to Sue. The parties agree she received an "Annulment Determination" on April 4, 2022. Def.'s Facts ¶ 86; Pl.'s Opp. Facts ¶ 86; Def.'s Mot., Ex. P. However, this is not synonymous with a right-to-sue letter. *See, e.g., Velasquez v. Metro Fuel Oil Corp.,* 12 F. Supp. 3d 387, 410 (E.D.N.Y. 2014) (Garaufis, J.) (noting plaintiff received a right-to-sue letter after plaintiff "successfully dismissed his NYSDHR complaint and annulled the election of remedies"). Because neither party briefed this issue, it does not serve as a basis for the Court's decision to dismiss Plaintiff's Title VII claims.

Sheet, ECF No. 1-1.[7] Having disposed of Plaintiff's federal claims, the Court must decide whether to exercise supplemental jurisdiction over her remaining causes of action. The Court declines to do so here.

Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "Once a district court's discretion is triggered under [28 U.S.C.] § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity, in deciding whether to exercise jurisdiction." *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (internal quotation marks and citation omitted); *see also King v. Davis*, 25-966, 2026 WL 762399, at *3 (2d Cir. Mar. 18, 2026). This decision is largely discretionary. *Radchenko v. Selfhelp Comm. Servs., Inc.*, 18-CV-6634, 2021 WL 11642000, at *4 (E.D.N.Y. Feb. 3, 2021) (Kuntz, J.)

"Once all federal claims have been dismissed, the balance of factors will usual[ly] point toward a declination [of supplemental jurisdiction][.]" *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 118 (2d Cir. 2013) (first alteration in original) (internal citation omitted). Courts throughout this Circuit disfavor the retention of supplemental jurisdiction over state law discrimination claims when federal discrimination claims have been dismissed, even after summary judgment briefing has been completed. *See, e.g., Radchenko,* 2021 WL 11642000, at *4 (rejecting supplemental jurisdiction over NYCHRL claims at summary judgment stage after federal discrimination claims were dismissed); *Williams v. A Team Sec., Inc.*, 20-CV-1568, 2023 WL 2742247, at *10 (E.D.N.Y. Mar. 31, 2023) (DeArcy Hall, J.)

---

[7] Plaintiff does not appear to argue for diversity jurisdiction in this case. *See* Am. Compl. ¶¶ 3–13; Civil Cover Sheet at 1.

(same); *Alejandro v. N.Y.C. Dept. of Ed.*, 15-CV-3346, 2017 WL 1215756, at *23 (S.D.N.Y. Mar. 31, 2017) (Nathan, J.) (same); *Dellaporte v. City Univ. of New York*, 998 F. Supp. 2d 214, 233 (S.D.N.Y. 2014) (Failla, J.) (same).

Indeed, as the Supreme Court recently noted in *Royal Canin U.S.A., Inc. v. Wullschleger*, where a federal court has dismissed "all claims over which is has original jurisdiction," "federal law is not where the real action is." 604 U.S. 22, 31–32 (2025). In such cases, "although supplemental jurisdiction persists, the district court need not exercise it: [i]nstead, the court may (and indeed, *ordinarily should*) kick the case to state court." *Id.* (emphasis added).

Where, as here, the Court has not yet reached the merits of any of Plaintiff's state discrimination claims, "federal law is not where the real action is." *Id.* The Court therefore declines to exercise jurisdiction over Plaintiff's remaining claims. Counts Two, Eight, Ten, Eleven, Twelve, and Thirteen are hereby dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. Defendant's Motion to Dismiss is DENIED as moot. The Clerk of Court is respectfully directed to terminate ECF Nos. 33 and 51.

**SO ORDERED.**

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: August 6, 2026
      Brooklyn, New York